**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**(UNDER SEAL -PUBLIC FILING ACCEPTABLE)**

**WASHINGTON HOPE,**

Plaintiff, pro se,

Case: 1:25–cv–04286 JURY DEMAND
Assigned To : Unassigned
Assign. Date : 12/1/2025
Description: Pro Se Gen. Civ. (F–DECK)

v.

**UNITED STATES OF AMERICA;**

**DEPARTMENT OF JUSTICE;**

**DEPARTMENT OF HOMELAND SECURITY;**

**FEDERAL BUREAU OF INVESTIGATION;**

**UNITED STATES SECRET SERVICE;**

**U.S. DEPARTMENT OF STATE (including Embassy Mexico City and Consulate Cancún);**

**UNITED STATES CAPITOL POLICE;**

**ARCHITECT OF THE CAPITOL;**

**CAPITOL POLICE BOARD;**

**HOUSE AND SENATE SERGEANTS-AT-ARMS (official capacity);**

**U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES (including the Centers for Medicare & Medicaid Services);**

**DEPARTMENT OF EDUCATION;**

**NATIONAL ARCHIVES AND RECORDS ADMINISTRATION;**

**SMITHSONIAN INSTITUTION;**

**EXECUTIVE OFFICE OF THE PRESIDENT (for preservation/coordination only; press/photography access protocols/photo negatives);**

**DISTRICT OF COLUMBIA,**

Defendants.

Civil Action No.____________________ (UNDER SEAL -Public Filing Acceptable)

**HONORABLE CHIEF JUDGE JAMES E. BOASBERG**



RECEIVED
DEC 01 2025
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND RESERVED MONETARY RELIEF**

*(Pro Se – Filed Under Seal)*

# Table of Contents

INTRODUCTION ........ 4

II. Jurisdiction and Venue ........ 5

III. Parties ........ 6

IV. Reservation of Certain Claims ........ 9

V. Factual Background ........ 11

A. January 6, 2021: Plaintiff's Property and the "Photo of Hope" ........ 11

.B. Surveillance, Watchlisting, and Retaliation Against Plaintiff ........ 14

C. Harm Suffered by Plaintiff ........ 21

VI. Causes of Action ........ 27

Count I – Fifth Amendment (Procedural Due Process – "Stigma-Plus" Violation) ........ 27

Count II – Fifth Amendment (Substantive Due Process – Right to Return and Family Integrity) ........ 30

Count III – Fifth Amendment (Equal Protection - Selective/Disparate Treatment) ........ 33

Count IV – Administrative Procedure Act (5 U.S.C. § 706 – Arbitrary and Unlawful Agency Action) ........ 36

Count V – Privacy Act (5 U.S.C. § 552a – Inaccurate Records and Unlawful Disclosures) 41

VII. Prayer for Relief ........ 47

A. Declaratory Relief: ..... 47

B. Injunctive Relief: ..... 48

C. Monetary Relief: ..... 51

D. Ancillary Relief: ..... 52

**Statutes**

18 U.S.C. §§ 1961–1964 ..... 10

**28 U.S.C. § 1331** ..... 5

**28 U.S.C. § 1391(b)** ..... 5

28 U.S.C. § 1402 ..... 5

28 U.S.C. § 2201 ..... 47

28 U.S.C. § 2675 ..... 10

**28 U.S.C. §§ 2201–2202** ..... 5

5 U.S.C § 552a(c) ..... 45

5 U.S.C § 552a(g)(4) ..... 45

**5 U.S.C. § 552a** ..... 41

5 U.S.C. § 552a(e)(5) ..... 41, 42

**5 U.S.C. § 552a(g)** ..... 5

5 U.S.C. § 552a(g)(1)(C) ..... 41

5 U.S.C. § 552a(g)(1)(D) ..... 41

5 U.S.C. § 552a(g)(2) and (g)(3) ..... 45

5 U.S.C. § 552a(g)(4)(B) ..... 52

5 U.S.C. § 706(2)(A) ..... 38

5 U.S.C. § 706(2)(A)–(C) .......... 37

**5 U.S.C. §§ 702, 706** .......... 5

Fifth Amendment .......... 27, 28, 29, 30, 47

**Constitutional Provisions**

Fifth .......... 23, 24, 25,29, 41

# I. INTRODUCTION

1. **Plaintiff Washington Hope** brings this civil action to challenge a campaign of **extra-judicial punishment** carried out under color of federal authority. Despite **never being charged or arrested** in connection with the events of January 6, 2021, Plaintiff was **treated as a criminal and terrorist**: his personal property was seized and publicly displayed as an "insurrection" symbol, his private data was secretly obtained and shared, and he was placed on **watchlists** that **effectively exiled** him from the United States without any due process. This **short and plain complaint** seeks to vindicate Plaintiff's constitutional and statutory rights, to **clear his name**, to **correct or expunge false government records**, and to recover for the severe personal and economic harm caused by Defendants' actions.

2. **In summary**, federal agents and officials used **false or misleading evidence** to implicate Plaintiff in a political narrative, labeled him with designations like "**violent extremist**" and "**terrorism-related person of interest**" without basis, and disseminated these stigmatizing labels across government databases and even to

the public. Plaintiff was **never given notice or an opportunity to be heard**. He has lived under a cloud of suspicion and fear of arrest for years, unable to return to his home country or continue his business. **No formal charges were ever brought**, yet the **punitive measures** against him have been as severe as if he had been convicted. This lawsuit aims to restore Plaintiff's **constitutional rights**, correct the record, and obtain **fair compensation** for the **extraordinary damage** he has suffered.

# II. Jurisdiction and Venue

3. **Jurisdiction.** This Court has jurisdiction under **28 U.S.C. § 1331** because this action arises under the **Constitution** and laws of the United States. The Court also has jurisdiction under the **Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 706**, to review agency actions, and under the **Privacy Act, 5 U.S.C. § 552a(g)**, to order correction of records and award damages for willful or intentional violations. In addition, this Court may grant declaratory relief pursuant to **28 U.S.C. §§ 2201–2202** (Declaratory Judgment Act).

4. **Venue.** Venue is proper in the District of Columbia under **28 U.S.C. § 1391(b)** (and 28 U.S.C. § 1402 for actions against the United States) because a substantial part of the events or omissions giving rise to the claims occurred in this District. The relevant investigations, watchlisting decisions, and records maintenance largely took place or were orchestrated from Washington, D.C., and the effects of those actions (including public exhibits and congressional activities) manifested in D.C.

# III. Parties

5. **Plaintiff Washington Hope** is a citizen of the United States. At the time of the events in question, Plaintiff resided in the United States. He is **currently residing abroad**, effectively **involuntarily exiled** due to the actions described in this Complaint. Plaintiff has no criminal record and has never been charged with any crime related to January 6, 2021 or otherwise.

6. **Defendant United States of America** is sued *in its capacity as a sovereign* to the extent permitted by law, including for equitable relief. The United States, through its agencies and officers, was responsible for the acts described herein, such as surveillance and watchlisting of Plaintiff and creation/dissemination of records concerning Plaintiff.

7. **Defendant U.S. Department of Justice (DOJ)** is the federal executive department that, among other things, oversees federal law enforcement agencies. Its component, the **Federal Bureau of Investigation (FBI),** conducted investigation and surveillance activities related to January 6, 2021. DOJ (including the FBI) maintains records about Plaintiff that are at issue in this case, and it participated in decisions to target Plaintiff with punitive measures (such as watchlist placement and dissemination of information). The DOJ and FBI are sued for declaratory and injunctive relief under the APA and Privacy Act, and any officials involved are sued in their individual capacities as noted in the counts below.

8. **Defendant U.S. Department of Homeland Security (DHS)** is the federal department responsible for, inter alia, transportation security and immigration. DHS—through sub-agencies such as the Transportation Security Administration (TSA) and U.S. Customs and Border Protection (CBP)—administers various security-screening systems, including risk-based travel identifiers and subsets of the Terrorist Screening Database. Upon information and belief, DHS maintains one or more adverse or derogatory security markers associated with Plaintiff, derived from secret investigative activity described herein. Although Plaintiff was not formally notified of any "No-Fly" designation, these DHS-maintained records created a credible and well-founded risk of detention, secondary screening, or arrest upon re-entry to the United States, effectively impeding Plaintiff's ability to travel safely and contributing to his constructive exile. DHS is sued for declaratory and injunctive relief under the APA and the Privacy Act in connection with its maintenance, use, and failure to correct these security-related records regarding Plaintiff.

9. **Defendant District of Columbia** is a municipal government which, through its officials or affiliated entities, participated in certain events and aftermath of January 6, 2021. For example, District of Columbia authorities cooperated with federal officials in responding to January 6 and may have generated or shared information about Plaintiff. The District is named as a defendant to ensure full relief can be afforded, including expungement of any District-held records referencing Plaintiff as a suspect or "person of interest," and to address any role District officials played in Plaintiff's reputational harm (e.g., participation in public dissemination of Plaintiff's

property or identity). No monetary relief is sought from the District of Columbia at this time; only equitable relief is sought against it if necessary to effectuate the correction of records or restoration of Plaintiff's rights within the District's control.

10. **Defendants John Doe 1–10 and Jane Doe 1–5** are *unknown federal agents or officials* who were personally involved in the actions challenged in this Complaint. These Doe Defendants include, upon information and belief, agents of the FBI or other federal agencies who surveilled Plaintiff, placed or kept him on watchlists, created or contributed to false records about him, or otherwise violated his rights. Their true names and identities are not currently known to Plaintiff. These Defendants are sued in their individual capacities for constitutional violations (Counts I–III), and Plaintiff will seek to amend this Complaint to substitute their real names once identified through discovery.

    a) **Defendant U.S. Department of Education (DOE)** is included because Plaintiff's forced exile and government-imposed watchlist status prevented him from returning to the United States to complete his higher education. DOE administers or oversees federal educational systems—including FAFSA eligibility, federal student aid regulations, institutional reporting, and national student record databases—which require physical presence, identity verification, and continued lawful residence. As a direct result of Defendants' conduct, Plaintiff lost the ability to continue and complete his degree program and was deprived of associated career opportunities, educational progression, and federal benefits regulated by DOE. Plaintiff seeks no monetary damages from DOE at this time

but includes DOE for necessary declaratory and injunctive relief tied to the restoration of his educational status, access to records, and correction of federally maintained information.

11. **All actions alleged** to have been taken by Defendants' officials, agents, or employees were done **under color of federal law** (or District of Columbia law, where applicable) and within the scope of their official duties, employment, or agency (except that individual-capacity claims allege acts outside any lawful authority). All Defendants caused or contributed to the harms described herein.

# IV. Reservation of Certain Claims

12. **Reserved FTCA Claims:** Plaintiff has initiated the administrative claim process under the **Federal Tort Claims Act (FTCA)** by submitting Standard Form 95 administrative claims to the appropriate federal agencies on **October 6, 2025**. Those claims seek damages for personal injury, property loss, and other harm arising from the conduct described in this Complaint (e.g. unlawful surveillance, intentional infliction of emotional distress, and other torts by federal officers). At the time of filing this Complaint, six months have not yet elapsed since the FTCA filings, and no final agency decisions have been made. **Accordingly, Plaintiff is not including FTCA causes of action in this Complaint**. Plaintiff expressly **reserves the right to amend** this Complaint to add **FTCA claims** (and to name the United States as a defendant for those claims) once the administrative exhaustion period

has run, as provided in 28 U.S.C. § 2675. Nothing in this Complaint is intended to waive or forfeit any such FTCA claims; they are preserved for future adjudication at the appropriate time.

13. **Reserved RICO Claims:** Plaintiff also notes that the factual allegations here may give rise to claims under the **Racketeer Influenced and Corrupt Organizations Act (RICO)**, 18 U.S.C. §§ 1961–1964, against certain individuals who participated in a pattern of racketeering activity (including obstruction of justice, fraud, and other predicate acts) in connection with the January 6 events and cover-up. At this time, Plaintiff **does not assert a RICO cause of action** in the interest of brevity and focus. However, Plaintiff **reserves the right to seek leave to add a RICO claim** in the future, if warranted by further evidence, and to substitute the true names of any unnamed co-conspirators or enterprise members as they become known.

14. **Other Unripe or Ancillary Matters:** To streamline this pleading, Plaintiff has also omitted or deferred any claims or requests for relief that are not yet ripe or that depend on future administrative outcomes. For example, to the extent Plaintiff's efforts to secure immigration benefits for immediate family members (impacted by Plaintiff's alleged "terrorist" designation) require judicial intervention, such claims will be brought in a separate action or added later if necessary. Plaintiff will similarly defer detailed arguments about discovery or damages calculations to later stages of the case. By reserving these matters, Plaintiff does not waive them but rather intends to **comply with Rule 8's mandate** for a short and plain statement focusing on the core ripe claims.

# V. Factual Background

## A. January 6, 2021: Plaintiff's Property and the "Photo of Hope"

15. **Participation in January 6 Events:** On January 6, 2021, Plaintiff Washington Hope was present in Washington, D.C., to exercise his First Amendment rights at the political rally and gatherings held that day. Plaintiff did **not engage in any violence or illegal conduct**. He did enter the vicinity of the U.S. Capitol during the unrest, but at no time did he assault anyone or damage property. Plaintiff peacefully observed events and then departed. He was not arrested on that day or thereafter, and **no criminal charges** were ever brought against him.

16. **Personal Property Left Behind:** During the chaotic events at the Capitol, Plaintiff inadvertently lost or left behind a personal item—specifically, a prescription medication bottle that belonged to him. This bottle bore unique identifying features, including a strain name, branding, and design recognizable only to Plaintiff and the issuing dispensary. It was subsequently among the debris recovered from the Capitol premises. Unbeknownst to Plaintiff at the time, this item would later become a widely circulated and high-profile piece of imagery associated with the January 6 aftermath.

17. **"Photo of Hope" Tableau:** In the evening of January 6, 2021, Rep. **Andy Kim**, a U.S. Congressman, was photographed cleaning up debris in the Capitol Rotunda. This widely publicized scene – often referred to in the media as the **"Photo of Hope"** – showed various items strewn on the floor being collected into blue bags. **Plaintiff's prescription bottle** was one of the items captured in this tableau (as later

confirmed by visual comparisons of the item's distinctive features in the images (Exhibits **Z, ZE, ZL**)). The photograph (and related video footage) of Congressman Kim with the debris was repeatedly used in news coverage and social media as a symbol of unity and recovery after the riot.

18. **Failure to Log Evidence:** Despite the bottle being **physical evidence** found on Capitol grounds, government authorities **failed to log, inventory, or preserve** it in any official chain-of-custody records. Exhibits **NP11, Z, ZH,** and **ZK** document that this piece of property was **never properly catalogued** as lost-and-found or evidence. The lack of proper handling meant that the item's ownership (and exculpatory value) was not formally recognized by investigators at the time.

19. **Smithsonian Exhibit Featuring Plaintiff's Property:** In the months following January 6, 2021, the **Smithsonian Institution** (a federal trust instrumentality) curated an exhibit about the events of that day. Among the display items was the very **prescription bottle belonging to Plaintiff**, presented as part of a collection of January 6 artifacts. Exhibits **ZH, ZG, ZK,** and **ZKA** show that Plaintiff's property remained on public display long after officials had reason to know who the owner was. The exhibit did not acknowledge Plaintiff's ownership; instead, the item continued to be portrayed as a generic remnant of a "rioter's" presence. This public display of Plaintiff's personal property – effectively **branding him as part of the insurrection** – caused ongoing stigma.

20. **Knowledge of Ownership:** By January 7th, approximately 2:22 AM, **government investigators and congressional staff became aware** that the prescription bottle likely belonged to Plaintiff. The item's unique attributes were not publicly available information; Plaintiff's identity could be (and was) deduced by those with access to investigative resources. Plaintiff has obtained a **Connecticut medical cannabis registry letter and purchase records** confirming his ownership of the bottle at the relevant time, which he submits herein (supporting documentation included in Exhibit **ZL**). Thus, at some point after January 6, authorities **knew or should have known** that Plaintiff – and **not any violent actor** – was the owner of this highly publicized "Photo of Hope" item.

21. **Republication of the Image by Officials:** Despite this knowledge, public officials continued to **re-use the "Photo of Hope" imagery** in ways that perpetuated the implication that the owner of those belongings (Plaintiff) was associated with domestic extremism. Notably, **Representative Andy Kim** himself, in official capacities, re-posted or discussed the image in later communications. On or about August 22, 2024, Rep. Kim's official YouTube channel posted content again featuring the January 6 cleanup images, including Plaintiff's bottle (Exhibit **ZM**). Again in another public video (Ex. **ZN**, timestamp ~19:10), the same imagery was used in the context of political messaging about January 6. Each such **re-publication** of Plaintiff's identifiable property in connection with narratives of insurrection compounded the reputational harm to Plaintiff, effectively **resetting the clock** on the stigmatization.

22. **Impact of the "Photo of Hope" Narrative:** Impact of the "Photo of Hope" Narrative: The continued circulation of the "Photo of Hope" imagery—featuring Plaintiff's personal property as a focal point—transformed Plaintiff into an **unwitting symbol of the January 6 events**. In the eyes of the public, he was no longer an individual with rights and context, but an anonymous "participant" whose belongings were displayed as an artifact of wrongdoing. This narrative imposed a lasting and damaging stigma on Plaintiff's reputation. Family, friends, professional contacts, and even foreign counterparts learned—through news coverage, official interviews, and the Smithsonian exhibit—that an item uniquely traceable to Plaintiff was presented as evidence linked to January 6 and, by implication, to extremism. Although Plaintiff's name was not publicly identified in media, the distinctive nature of the item and insider awareness within his community resulted in Plaintiff being associated with the stigma of being an "insurrectionist," compounding the reputational injury central to his stigma-plus claim

## .B. Surveillance, Watchlisting, and Retaliation Against Plaintiff

23. **Secret Surveillance of Plaintiff:** Secret Surveillance of Plaintiff: Following January 6, 2021, federal authorities undertook investigative measures targeting Plaintiff, despite the absence of any criminal charge. On information and belief, Plaintiff's call records and related metadata were accessed or obtained between February and May 2021, during the government's initial dragnet collection period associated with the January 6 investigations. This early surveillance occurred without Plaintiff's knowledge, without a warrant, and outside ordinary criminal procedure. Years later,

the existence of a sealed May 25, 2023 subpoena—signed by the Chief Judge of this Court and directed to Verizon—**confirmed that Plaintiff's communications data had been swept into the broader investigative apparatus under secrecy orders**. Although the 2023 subpoena does not represent the first acquisition of Plaintiff's data, it corroborates that Plaintiff's information was subjected to ongoing, undisclosed law-enforcement access and that the government concealed such surveillance from Plaintiff for years. Upon later review, Plaintiff learned this investigative activity was tied to the flawed "pipe bomb" inquiry described below.

24. **Improper Use of Subpoenaed Data:** The telecommunications data obtained from Verizon was used to identify, monitor, or track Plaintiff even though no probable cause linked him to any criminal activity. In late 2024, Verizon publicly admitted that certain January 6–related subpoenas and nondisclosure orders had been improperly processed, including disclosures made without adequate legal review. *See* Exhibit NP41A (Verizon testimony). This admission provided Plaintiff, for the first time, with external confirmation that his own communications data had likely been acquired as part of a broader, secret data-sweep associated with the January 6 investigations. The Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701–2712, generally prohibits such warrantless access to customer records. Upon information and belief, the FBI's method of obtaining Plaintiff's phone metadata in early 2021 circumvented the protections required by the SCA and constituted an unlawful search and seizure of Plaintiff's personal information. Plaintiff could not reasonably have discovered this violation earlier because the government actively concealed its

surveillance through sealed proceedings, nondisclosure orders, and delayed disclosures until whistleblower revelations and Verizon's 2024 testimony made these practices public.

25. **False Investigative Premise – "Pipe Bomb" Narrative:** One reason Plaintiff was targeted appears to be a **fabricated investigative premise** tying him to the unsolved pipe bombs planted near the Democratic National Committee (DNC) and Republican National Committee (RNC) headquarters on January 5, 2021. Federal agents seemingly posited that Plaintiff's presence in D.C. and the discovery of his item at the Capitol made him a suspect or person of interest in that pipe-bomb plot. However, newly obtained evidence (Exhibit **NP75H**) demonstrates that the **"pipe bomb narrative" was gravely flawed**: jurisdiction over the bomb investigation lay with the Capitol Police Board (not the FBI) and was handled in a politicized manner, with selective release of surveillance footage and inconsistent timelines. In short, **no credible evidence** ever linked Plaintiff to the pipe bombs; the narrative was a pretext to justify heightened scrutiny. The FBI nonetheless relied on this false predicate to open or continue an investigation into Plaintiff and to justify extraordinary measures against him.

26. **Placement on Watchlists and Travel Restraints: Adverse Security Flagging and Travel Restraints:** As a direct result of the secret investigation and the creation of inaccurate or misleading government records, Plaintiff was assigned one or more adverse security identifiers within federal screening systems administered by DHS, TSA, and CBP. Upon information and belief, this designation—whether as a

"selectee," "elevated-risk passenger," or other TSDB-associated marker—was applied in early 2021, without notice, without probable cause, and without any due-process mechanism for challenge or review. Plaintiff does *not* allege formal placement on the "No Fly List." Rather, Plaintiff alleges that this adverse designation created a credible and well-founded risk of detention, invasive secondary screening, or arrest upon attempting to re-enter the United States. By 2023, based on attorney guidance, government conduct, sealed investigative activity, and intimidation detailed elsewhere in this Complaint, Plaintiff reasonably concluded that air travel—especially travel into the United States—posed a substantial and unjustified risk of wrongful detention. Accordingly, although physically capable of boarding flights, Plaintiff ceased air travel and remained outside the United States out of self-protection. Government actions therefore operated as a *constructive travel ban*, depriving Plaintiff of his constitutional right to return to his country and resulting in his constructive exile without any charge, hearing, or lawful process.

27. **Threat of Arrest Without Charge:** Government conduct further reinforced Plaintiff's reasonable fear that returning to the United States would result in wrongful detention. In or around October 2024, FBI and/or Joint Task Force personnel visited a U.S. residence associated with Plaintiff and displayed images taken from television broadcasts and media coverage of January 6. At the time, Plaintiff understood these images to be presented as evidence; however, in hindsight, the materials shown were not investigative records but publicly available, media-produced imagery that Plaintiff now knows included staged, misleading, or

**propagandized representations of events.** The agents' reliance on such non-evidentiary media footage—while implying that Plaintiff could be arrested if he returned—served no legitimate investigative purpose and instead functioned as intimidation. This conduct demonstrated that federal officials continued to treat Plaintiff as a criminal suspect despite the absence of probable cause or charges. These intimidating encounters reasonably led Plaintiff to believe that attempting to fly into the United States or appearing at a port of entry would expose him to immediate detention based on inaccurate government records, adverse security markers, and the false narrative being promoted through media imagery, thereby further contributing to Plaintiff's constructive exile.

28. **Government Knowledge of Falsity:** Throughout this period, officials at the DOJ, FBI, and other agencies either **knew or recklessly disregarded** the fact that the information targeting Plaintiff was false or highly misleading. Key factors include:

    a) **Plaintiff was never charged with any crime, and no inculpatory evidence ever emerged at any stage of the January 6 investigations.** This alone should have triggered an internal review and removal of any derogatory security markers, adverse identifiers, or risk-based travel flags associated with Plaintiff. Instead, federal agencies allowed inaccurate or misleading information to remain active in their systems—despite years of investigative inactivity, exculpatory context, and the absence of any lawful predicate—demonstrating that officials either knew the underlying information was false or recklessly disregarded its falsity.

b) The **chain-of-custody for crucial physical evidence** (like Plaintiff's bottle) had collapsed, undermining any basis to tie him to criminal acts;

c) **Witness admissions** emerged that the January 6 narrative had been "**bent**" or manipulated – for example, congressional staff and whistleblowers revealed planning and informant involvement that cast doubt on official stories (Ex. **NP80** and **NP80A**, statements by former House staff and Kash Patel acknowledging pre-planned elements); and

d) internal **agency communications** (some referenced in Congress) indicated that designating individuals like Plaintiff was used as "**punishment**" rather than for valid security reasons. In sum, by 2022 and certainly by 2024, Defendants either knew the allegations against Plaintiff lacked any real substance or consciously chose to ignore exonerating information.

29. **Refusal to Correct or Clarify:** Plaintiff, through informal inquiries and public channels, sought to clear his name and correct the record. He provided information to certain authorities about his benign involvement in January 6 and the true story of the "Photo of Hope" item. These efforts were met with silence or stonewalling. No agency provided Plaintiff any **notice of accusations or opportunity to contest** the watchlist designation or records, as required by basic due process. Even after widespread public knowledge that many January 6 suspects had been overinclusive or wrongful, Plaintiff's status did not change. The **false labels** ("insurrectionist,"

"violent extremist," etc.) remained in government databases, continuing to trigger alerts and adverse actions whenever Plaintiff's identity crossed any official's desk.

30. **Coordinated Media and Public Narrative:** During 2021–Present, federal officials (and their legislative allies) made a concerted effort to **promote a narrative** about January 6 that included highlighting certain individuals as examples of domestic extremism. Plaintiff became one such example, albeit without being named: through leaks, insinuations, and exhibits like the Smithsonian's, the government ensured the story of Plaintiff's involvement remained a cautionary tale. On information and belief, federal agents or officials **coordinated with media outlets** to propagate images and stories that kept Plaintiff stigmatized (e.g., footage of the "Photo of Hope" debris was repeatedly aired in documentaries and news segments funded in part by federal grants). This amounted to **punishment by narrative** – using extrajudicial publicity to impose consequences on Plaintiff in absence of any trial. Such actions were taken in retaliation for Plaintiff's perceived political stance or simply to avoid admitting mistakes in the investigation.

31. **No Charges, No Process:** As of the filing of this Complaint, Plaintiff has never been arrested, indicted, or otherwise formally accused of any crime by the Department of Justice related to January 6 or any other matter. He has **no venue to clear his name** except this Court. The criminal investigations have either quietly closed or gone dormant, yet the **collateral consequences** (watchlist status, damaged reputation, lost opportunities) persist. Plaintiff occupies a **legal limbo**: branded as a criminal without charge, punished without conviction, and unable to obtain closure. This

scenario is precisely what the **Fifth Amendment's Due Process Clause** is meant to prevent – the imposition of severe deprivations (liberty, property, and dignity) without notice or hearing.

## C. Harm Suffered by Plaintiff

32. As a direct and proximate result of Defendants' actions described above, Plaintiff Washington Hope has suffered extreme and ongoing harm, including but not limited to the following:

a) **Loss of Liberty (Exile):** Plaintiff has been effectively unable to return safely to the United States, his homeland. Although no formal travel ban is known to exist, federal investigative conduct, adverse security markers, intimidation by federal agents, and the credible risk of wrongful detention created substantial and well-founded fear that attempting re-entry would result in arrest based on inaccurate or misleading government records. As a result, Plaintiff has been forced to remain outside the country, separated from his family, friends, and community. This constructive exile constitutes a profound deprivation of liberty—the right of a U.S. citizen to travel freely and to re-enter the United States without fear of unjustified detention.

b) **Reputational Stigma:** Plaintiff's **reputation has been destroyed worldwide.** In official records he is falsely labeled as an *"insurrectionist"* and *"terrorist"*. In the public realm, through exhibits and media, he has been portrayed as a participant in a notorious event. This stigma has altered his

legal status and rights in tangible ways – a quintessential **stigma-plus injury** (reputation injury coupled with alteration of legal status). He carries a government-created "badge of infamy" that closes doors and invites suspicion everywhere.

c) **Economic and Business Losses:** Plaintiff's technology, funding, and energy-infrastructure ventures—each of which showed substantial growth and commercial promise prior to 2021—have collapsed as a direct result of Defendants' actions. Multi-billion-dollar international projects, contracts, and investment agreements were derailed once Plaintiff was treated as a security risk and once adverse, inaccurate federal records created the appearance that Plaintiff was associated with criminal or extremist activity. For example, Plaintiff had ongoing developments in multiple jurisdictions totaling more than **$60 billion** in projected infrastructure value, supported by executed agreements and confirmed funding pathways. *See* **Exhibits W and H** (representative contracts and commitments). These opportunities evaporated when business partners learned of the derogatory federal identifiers associated with Plaintiff, when federal agents' intimidation became known within Plaintiff's network, and when Plaintiff was unable to travel safely to consummate or manage deals due to the well-founded risk of detention. The resulting economic damage is catastrophic: Plaintiff's company, earning capacity, and long-term commercial prospects have been effectively destroyed by Defendants' unlawful conduct.

d) **Emotional Distress and Personal Hardship:** Plaintiff has endured severe emotional and psychological distress. Being unjustly branded—both publicly and within federal systems—as a threat or traitor to one's country and living under the constant fear of sudden arrest inflicts enormous mental harm. Plaintiff experiences anxiety, depression, and a pervasive sense of betrayal by his own government. His personal relationships have also suffered. Because Plaintiff could not safely return to the United States, he was forced to make life-altering decisions abroad under duress, including entering into a marriage overseas to maintain lawful residency and beginning a family outside the United States, as reunification in the U.S. was impossible under the circumstances created by Defendants. These deeply personal choices were coerced by Defendants' actions—Plaintiff's inability to sponsor his spouse or pursue normal immigration processes was the direct result of the adverse, inaccurate, and stigmatizing federal records associated with him, combined with the financial destruction Defendants caused. Plaintiff's emotional injuries remain ongoing and profound.

e) **Physical Harm:** During the January 6 chaos, Plaintiff was subjected to **physical force by law enforcement** officers attempting to control the crowd. Plaintiff held his hands in the air and repeatedly told officers to "calm down," emphasizing that he was not assaulting anyone. Despite this, **one officer struck Plaintiff multiple times** while engaged with other nearby individuals, and at least one officer continued hitting Plaintiff even as he

stood with his hands raised. During the encounter, an officer apologized to Plaintiff and stated he was "just doing [his] job," acknowledging the use of force against Plaintiff despite Plaintiff's non-resistance. These blows caused minor physical injuries but, more importantly, left Plaintiff with no meaningful avenue for redress—because he was never charged, he had no criminal case in which to challenge or litigate the reasonableness of the force used or the subsequent seizure of his property. The resulting physical trauma, combined with years of uncertainty, wrongful suspicion, and constructive exile, has had continuing negative effects on Plaintiff's health.

f) **Property Deprivations:** Plaintiff's **tangible and intangible property** rights were violated. His physical property (the prescription bottle and possibly other belongings from that day) was never returned and remains exploited for others' purposes. Moreover, by labeling him and preventing him from accessing his business and contracts, Defendants have **taken Plaintiff's property interests** in those contracts and economic expectancies without due process. In effect, his entire business enterprise was taken or destroyed by government action without compensation or hearing.

33. **Continuing Nature of Harm:** The harms described above are not past or concluded—they remain ongoing. Plaintiff continues to suffer the effects of inaccurate, misleading, and stigmatizing federal records that, upon information and belief, remain active within government databases and security-screening systems. Although Plaintiff does not allege formal placement on any particular "watchlist,"

the adverse security identifiers, false investigative inferences, and uncorrected records associated with him continue to create a credible risk of detention, travel interference, and reputational damage. The public stigma persists through the continued circulation of the "Photo of Hope" imagery, the Smithsonian exhibit, and online sources. Each day that federal agencies fail to correct these records or repudiate the false narrative constitutes a fresh injury to Plaintiff's rights, reputation, and liberty interests. Accordingly, the violations at issue are continuing in nature and remain active through the present day.

34. **Exhaustion and Lack of Alternative Remedies:** Plaintiff has no administrative avenue to adequately redress these harms. Any internal agency "redress" programs (such as the DHS Traveler Redress Inquiry Program) are futile here – they do not afford an opportunity to challenge the underlying legitimacy of secret designations, especially not those rooted in law enforcement records. Plaintiff has nonetheless made good-faith efforts: he has inquired with agencies and invoked whatever processes were suggested, but to no avail. No agency has offered to clear his status or compensate his losses. Therefore, Plaintiff turns to this Court as **his only avenue for relief** and to put an end to this unlawful pattern of conduct.

35. **Timeliness of Claims:** Although the events began in January 2021, Plaintiff's claims are timely under all applicable statutes of limitations. Plaintiff's injuries are continuing in nature—accruing anew each day that inaccurate federal records, adverse security identifiers, and public stigma remain uncorrected—and several critical facts underlying these claims were not reasonably discoverable until 2023–

2025. The government actively concealed material information, including the secret acquisition of Plaintiff's telecommunications data, the sealed supervisory process governing such subpoenas, and the behind-the-scenes role of federal investigative agencies. Whistleblower disclosures, congressional testimony, and public releases beginning in 2023–2025 revealed for the first time: (1) former Speaker Nancy Pelosi's public admission of responsibility for security failures on January 6; (2) statements by a senior Pelosi staffer confirming that elements of January 6 were planned more than two years in advance (*see*, e.g., Exhibits NP80 and NP80A); and (3) evidence that FBI Director Christopher Wray concealed, minimized, or falsely denied the presence and scope of undercover agents active in and around the Capitol on January 6. These revelations materially altered Plaintiff's understanding of the operative facts and confirmed that the government's narrative—used to justify the ongoing maintenance of false or stigmatizing records concerning Plaintiff—was incomplete, misleading, or intentionally distorted. Furthermore, each republication of the defamatory "Photo of Hope" narrative, including by Rep. Kim and the Smithsonian, resets the limitations period for stigma-plus injuries. Likewise, each day federal agencies maintain, rely on, or disseminate inaccurate or misleading records concerning Plaintiff constitutes a fresh, actionable injury. Accordingly, under the doctrines of equitable tolling, fraudulent concealment, delayed discovery, and the continuing violation doctrine, this Complaint is timely filed.

36. Plaintiff repeats and realleges the above factual averments in each of the causes of action below as if fully set forth therein.

# VI. Causes of Action

## Count I – Fifth Amendment (Procedural Due Process – "Stigma-Plus" Violation)

37. **Nature of Claim:** This count is brought against the **individual federal Defendants** responsible for placing Plaintiff on watchlists, disseminating stigmatizing information, and otherwise depriving him of liberty and property interests without due process (currently named as John/Jane Doe defendants, to be identified). To the extent necessary for complete relief, Plaintiff also seeks equitable relief against the relevant **agency Defendants** (DOJ, FBI, DHS) under this count. The claim arises directly under the **Fifth Amendment's Due Process Clause**, seeking a **Bivens** remedy for constitutional violations by federal officers.

38. **Protected Interests: Protected Interests:** Plaintiff has constitutionally protected liberty interests, including the right to travel internationally, the right to safely re-enter the United States, and the right to be free from government-imposed stigma that alters his legal status. Plaintiff also possesses property interests in his tangible belongings and in the legitimate expectation of continuing his profession and business free from unwarranted government interference. Defendants' actions, as described, deprived Plaintiff of these interests. Plaintiff was branded as a criminal and, although not formally prohibited from travel, was effectively prevented from safely returning to the United States due to the government-created risk of wrongful detention and reliance on inaccurate records. His business contracts and

professional opportunities were nullified as a result, all without notice or any form of due process.

39. **Stigma-Plus Elements:** Defendants publicly (and in official records) attached a "**stigma**" to Plaintiff – effectively calling him a terrorist/insurrectionist – and that stigma was coupled with concrete detriments (the "**plus**"), such as being watchlisted (loss of freedom to travel), loss of employment and business opportunities (loss of property rights), and the ongoing exhibition of his private property as contraband (property deprivation and reputational harm). This combination of defamation by the government plus alteration of Plaintiff's legal status and rights constitutes a classic **stigma-plus due process violation**.

40. **Lack of Due Process:** Plaintiff was given **no procedural safeguards** before or after these deprivations. Defendants never notified him that he was under investigation or watchlisted. He was not told that his name or identifiers would be entered into databases as a threat. He was afforded **no opportunity to challenge** the false allegations or present evidence on his own behalf. Even after the fact, when it became clear Plaintiff had not committed any crime, Defendants did not clear his name or remove the restrictions. The failure to provide any hearing, appeal, or corrective process is a direct violation of the Fifth Amendment's guarantee that the government cannot deprive a person of liberty or property **without due process of law**.

41. **Arbitrary and Malicious Conduct:** The actions against Plaintiff were not a result of a bona fide mistake or a routine administrative error; they were **deliberate and reckless**. Defendants took these actions with at least reckless disregard for Plaintiff's rights, and in some instances with malicious intent (for example, using the watchlist as "punishment" for Plaintiff's perceived views, or to scapegoat him). Such misuse of government power against an uncharged individual is the type of unconstitutional conduct that a **Bivens** action is meant to address, as no other remedy is available to Plaintiff for this grievance.

42. **Injury:** As a proximate result of the stigma-plus due process violation by Defendants, Plaintiff has suffered the harms detailed above (loss of liberty, reputation, property, etc.). These harms are continuing in nature. Plaintiff has been denied the fundamental fairness that the Fifth Amendment requires.

43. **Relief Sought:** Plaintiff seeks declaratory relief that Defendants' actions violated his Fifth Amendment due process rights, and an injunction requiring Defendants to **clear Plaintiff's name** by removing false information from government records and clearing any watchlist or security designations imposed on him without basis. Plaintiff also seeks an award of **monetary damages** against the individual Defendants in an amount to be determined, to compensate for the personal and economic injuries caused by the due process violations. In addition, Plaintiff seeks **punitive damages** against the individual Defendants to the extent permitted by law, given the willful and egregious nature of their misconduct, in order to deter such extrajudicial punishment in the future.

## Count II – Fifth Amendment (Substantive Due Process – Right to Return and Family Integrity)

44. **Nature of Claim:** This count is brought against the **individual federal Defendants** (John/Jane Does to be identified) who imposed or enforced restrictions that have kept Plaintiff exiled and interfered with his family life, as well as against the relevant **agencies** for injunctive purposes. It arises under the Fifth Amendment's **guarantee of substantive due process**, which protects fundamental rights from unjustified government interference. A cause of action is implied under the Constitution (Bivens-type) against the responsible officers.

45. **Right to International Travel and Re-entry:** It is a fundamental incident of American citizenship that an individual may travel abroad and return freely to the United States. Plaintiff's right to return home is deeply rooted in the concept of liberty. Defendants effectively blocked Plaintiff's return—not through any formal legal prohibition, but through the creation of inaccurate and adverse federal security records, intimidation by federal agents, concealment of investigative activities, and a credible, well-founded risk of wrongful detention upon re-entry. This government-created danger rendered Plaintiff unable to safely exercise his right to return and forced him to remain abroad. Such interference is not narrowly tailored to any compelling governmental interest; indeed, there is no legitimate interest in preventing the return of a U.S. citizen who has never been charged with any crime and poses no actual threat. Defendants' actions shock the conscience in that they

deliberately placed an innocent citizen in prolonged limbo outside his country without any notice, charge, or lawful process.

46. **Right to Family Life and Integrity:** Plaintiff also asserts a fundamental right to **family integrity and personal choices relating to marriage and child-rearing**. The Supreme Court and Constitution recognize that individuals have a liberty interest in marrying, establishing a home, and raising children without unwarranted government intrusion. Defendants' conduct, by exiling Plaintiff and destroying his finances and reputation, **coerced drastic alterations to Plaintiff's family life**. He was effectively forced to marry abroad under less-than-voluntary circumstances – a decision driven by necessity to maintain a legal status outside the U.S. because returning was not feasible. Likewise, decisions about having children were made in a context where Plaintiff could not bring his family to the U.S. or live normally. This amounts to an **unconstitutional infringement** on intimate personal decisions.

47. **No Justification or Process:** The substantive due process violation is heightened by the fact that **no substantive justification** exists for Defendants' actions. They had no charge, no conviction, and no emergency that would warrant overriding these fundamental rights. The measures taken (watchlisting, etc.) were purportedly for security, but since Plaintiff committed no crime and Defendants knew or should have known that, their actions lack any rational basis, let alone a compelling interest. Furthermore, even if some interest were claimed, the means chosen (permanent exile, family separation) are **so egregiously overbroad and punitive** as to be unconstitutional. Defendants could have achieved any legitimate investigative

aims through far less restrictive means (e.g., an interview or monitoring within the law). Instead, they opted for **extreme measures** that are constitutionally intolerable.

48. **Injury:** Defendants' violation of Plaintiff's substantive due process rights has caused profound harm. Plaintiff has lost irreplaceable time with family, suffered the stress of uncertain status, and been denied the joys and opportunities of normal family life in his home country. The harm is ongoing as long as he remains unable to safely return and reunite on U.S. soil with extended family and friends.

49. **Relief Sought:** Plaintiff seeks a declaration that Defendants' actions unlawfully violated his fundamental rights to travel and family integrity. Plaintiff further seeks injunctive relief ordering Defendants to **allow and facilitate his prompt return to the United States without harassment or arrest** (absent any actual warrant or charge), and to **remove any conditions that impede his re-entry**. This may include, for example, instructing relevant agencies to clear watchlist entries and coordinate safe passage. Additionally, Plaintiff seeks an order enjoining Defendants from continuing to interfere with his marriage and family life – for instance, by **waiving or suspending any onerous immigration or sponsorship requirements** that have become impossible for Plaintiff to fulfill due to Defendants' own actions (such as income requirements for sponsoring a spouse, given that Defendants' conduct destroyed Plaintiff's earning capacity). In terms of damages, Plaintiff seeks compensatory damages against the individual Defendants for the violation of his substantive due process rights, in an amount reflecting the intangible but very real

harm of lost family companionship, emotional distress, and other consequences of the forced exile and family separation. Punitive damages are also sought against the individual Defendants for this outrageous and deliberately harmful conduct, to the extent permitted by law.

## Count III – Fifth Amendment (Equal Protection - Selective/Disparate Treatment)

50. **Nature of Claim:** This count is brought against the **individual federal Defendants** (to be identified) who targeted Plaintiff for adverse treatment due to illegitimate reasons such as his perceived political beliefs or symbolic value, in violation of the **equal protection component of the Fifth Amendment's Due Process Clause**. It seeks relief against those individuals (in their personal capacities) and appropriate equitable relief against agencies to cease any discriminatory practices.

51. **Selective Treatment of Plaintiff:** Plaintiff was **intentionally treated differently** from other individuals who were present at or connected to the events of January 6, and this disparate treatment lacked any lawful or rational basis. Hundreds of other attendees — including individuals who engaged in unlawful conduct — were either formally charged and afforded the protections of the judicial process, or, if uncharged, were eventually able to resume their normal lives without covert sanctions or ongoing suspicion. By contrast, Plaintiff, who committed no chargeable offense, was singled out for extraordinary and clandestine forms of government retaliation. These included the creation and preservation of inaccurate and stigmatizing federal records, the misuse of Plaintiff's personal property as a

public symbol of wrongdoing, the circulation of misleading media imagery to intimidate Plaintiff, and the assignment of adverse security identifiers that prevented Plaintiff from safely returning to the United States. Such disproportionate and secretive treatment, applied uniquely to Plaintiff, reflects discriminatory animus and violates the equal protection component of the Fifth Amendment

52. **Impermissible Motive – Viewpoint Discrimination:** Upon information and belief, Defendants' unusual harsh treatment of Plaintiff was motivated by **political and retaliatory considerations**. Plaintiff was perceived (correctly or not) as having a certain political viewpoint due to his presence at a pro-Trump rally and the symbolism of his property in the Capitol. Federal officials involved harbored animus toward this viewpoint and decided to make Plaintiff into an example. Government agents effectively coordinated with media and other entities to **punish Plaintiff for a perceived political affiliation**, which is **textbook viewpoint discrimination** prohibited by the First and Fifth Amendments. Additionally, the fact that Plaintiff's property became a widely used image made him a convenient scapegoat or symbol to bolster a narrative; Defendants exploited this rather than treating Plaintiff impartially.

53. **Similarly Situated Comparators: Similarly Situated Comparators:** Other individuals similarly situated to Plaintiff—namely, persons who were present on January 6 but never charged with any offense—were not subjected to the secret, punitive, and extrajudicial measures that Plaintiff endured. Numerous rally attendees who faced no charges were able to resume their normal lives without

lingering federal suspicion, adverse security identifiers, or covert investigative pressure. Even individuals who were criminally charged—including prominent members of groups such as the Proud Boys or Oath Keepers—were afforded the protections of the judicial process, resolved their cases through known legal channels, and, in some instances, later received pardons or sentence reductions. In stark contrast, Plaintiff, despite committing no chargeable offense, received no due process, no mechanism to clear his name, and no path to resolution. Plaintiff instead suffered a harsher outcome than many convicted defendants: prolonged constructive exile, the continued maintenance of inaccurate and stigmatizing federal records, reputational destruction, and intimidation by federal authorities. This stark disparity lacks any legitimate justification and strongly suggests discriminatory intent or viewpoint-based retaliation.

54. **No Rational Basis or Legitimate Purpose:** There is no rational or legitimate government purpose that can justify why Plaintiff specifically was treated with such hidden penalties when he was **never even accused of a crime**. Any security argument fails because if Plaintiff were truly dangerous, the government's proper course would have been to charge him or at least openly detain him – not leave him free but blacklisted. The illogical approach taken indicates that the reasons were illegitimate. Thus, even under a deferential standard, the discrimination against Plaintiff is irrational and arbitrary. Under a heightened standard (since viewpoint-based targeting is involved), it is blatantly unconstitutional.

55. **Injury:** Plaintiff suffered all the harms previously described (reputational, economic, emotional, etc.) as a result of this selective and discriminatory treatment. He has also suffered the **dignitary harm** of knowing that his own government treated him not on the basis of conduct but on the basis of perceived identity or viewpoint, which is contrary to the equal protection guarantees.

56. **Relief Sought:** Plaintiff seeks a declaration that Defendants violated his right to equal protection by intentionally and arbitrarily singling him out for adverse treatment. He also seeks injunctions as needed to halt any ongoing discriminatory enforcement (for instance, an order to remove Plaintiff from any watchlist or registry where he is listed unless a legitimate, non-discriminatory reason can be documented in camera to the Court). Furthermore, Plaintiff requests compensatory damages against the individual Defendants who orchestrated or carried out the discriminatory actions, to compensate for the specific harms from being unjustly targeted (including the damage to his reputation and losses stemming from the disparity in treatment). Plaintiff also seeks punitive damages against the individual Defendants for their willful and malicious violation of his rights, as their discriminatory conduct was knowing and intentional.

## Count IV – Administrative Procedure Act (5 U.S.C. § 706 – Arbitrary and Unlawful Agency Action)

57. **Nature of Claim:** This count is brought against the **agency Defendants** – primarily the Department of Justice (including the FBI) and the Department of Homeland Security – under the Administrative Procedure Act ("APA"). Plaintiff challenges a

series of agency actions (or failures to act) as **arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law**, and in excess of statutory authority, in violation of 5 U.S.C. § 706(2)(A)–(C). This count seeks **vacatur of those actions and other equitable relief**. No monetary damages are sought under the APA.

58. **Agency Actions at Issue:** The actions (and inactions) to be set aside include, but are not limited to:

    a) the decision to designate Plaintiff in federal terrorist screening databases or watchlists;

    b) the maintenance of records labeling Plaintiff as a threat or criminal in agency files (e.g., NCIC entries, FBI indices, Homeland Security watchlists) without factual basis;

    c) the sharing and dissemination of those records to other agencies or partners (including foreign governments) which effectively blacklist Plaintiff;

    d) the failure to purge or correct such records once their falsity was known; and

    e) the use of investigative techniques (such as subpoenas for phone records or surveillance) against Plaintiff without proper predicate and in violation of governing statutes and regulations.

59. **Arbitrary and Capricious: Arbitrary and Capricious:** The agency actions described above were arbitrary and capricious because the responsible agencies relied on

factors Congress did not intend them to consider, ignored critical exculpatory information, and offered no reasoned explanation for treating Plaintiff as a security threat. The assignment and continued maintenance of adverse federal security identifiers or derogatory records concerning Plaintiff was irrational given that Plaintiff was never charged with any crime, engaged in no violent conduct, and was the subject of substantial exculpatory evidence and alternative factual narratives revealed through whistleblowers, congressional testimony, and post-event investigations. Agencies failed to consider the profound and unwarranted harm caused by maintaining inaccurate records and failed to reassess Plaintiff's status as circumstances evolved and investigations closed with no implication of Plaintiff whatsoever. The lack of a rational connection between the facts of Plaintiff's actual behavior and the government's decision to treat him as a suspected extremist renders these actions unlawful under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

60. **Contrary to Law / Ultra Vires:** Some of the actions were also **contrary to law**. For instance, the FBI's acquisition of Plaintiff's telephone and electronic communication records **violated the Stored Communications Act** and possibly the Fourth Amendment, making that action "not in accordance with law." Using evidence obtained from such unlawful means to then justify further action (like watchlisting) taints those subsequent decisions as well. Additionally, any watchlist placement done as "punishment" rather than for its intended preventive purpose exceeds the legal authority granted to agencies (which do not have power to punish

without trial). If, as it appears, agencies were effectively using the watchlist to impose sanctions on Plaintiff for supposed past conduct, that is an **ultra vires purpose** not sanctioned by any statute or regulation. Moreover, agencies failed to follow their own rules (for example, if DHS or FBI guidelines require periodic review of watchlist entries or removal of entries that lack derogatory information, the failure to remove Plaintiff violates the **Accardi doctrine** requiring agencies to follow their own regulations).

61. **Lack of Finality/Notice:** To the extent the agencies may argue no single "final" action occurred, Plaintiff alleges that the **cumulative actions and refusals to act** constitute a final agency position as to Plaintiff's status. Plaintiff has effectively been **denied delisting or exoneration,** which is the consummation of the agency decision-making process regarding him. He has no further means within the agencies to seek relief (thus it is final for APA purposes). The ongoing retention of false information is an **ongoing agency action** subject to review.

62. **Harm and Standing:** As detailed earlier, Plaintiff has suffered concrete injuries from these agency actions: inability to travel, loss of contracts, reputational harm, etc. These are interests within the zone of interests of statutes like the Privacy Act (accuracy of records) and the constitutional guarantees that the APA allows to be vindicated by setting aside unlawful agency conduct. Plaintiff thus has standing under the APA to seek redress for the wrongs inflicted by these agencies' arbitrary conduct.

63. **Relief Sought:** Pursuant to 5 U.S.C. § 706, Plaintiff seeks an order from this Court **holding unlawful and setting aside** the aforementioned agency actions. Specifically, Plaintiff requests that the Court:

a) **Vacate any determination or listing** by DOJ, FBI, DHS or their sub-agencies that identifies Plaintiff as a terror threat, watchlist designee, or similar, and order his **immediate removal from all such lists or databases**.

b) **Order the correction or expungement** of all inaccurate or derogatory records about Plaintiff that those agencies maintain, including records falsely suggesting Plaintiff was involved in terrorism or violent crime on January 6, 2021. (This relief coincides with Privacy Act obligations as well.)

c) **Enjoin the agencies from relisting or disseminating** such information absent new, actual evidence warranting such action and after providing Plaintiff due process.

d) Declare that the agency actions were arbitrary, capricious, and **in excess of statutory authority**, and that any future investigative steps against Plaintiff must comply fully with the law (for example, no surveillance without proper warrants or predicates).

e) Provide any further equitable relief necessary to restore Plaintiff's rights – for instance, notifying law enforcement partners (including international lists) that Plaintiff is **no longer deemed a security threat**, so that travel restrictions are effectively lifted.

64. No monetary damages are sought under this count (those are addressed in other counts); however, Plaintiff does seek an award of **reasonable costs and attorney's fees** under the APA or the Equal Access to Justice Act, if applicable, for having to bring this action to correct agencies' unlawful action.

## Count V – Privacy Act (5 U.S.C. § 552a – Inaccurate Records and Unlawful Disclosures)

65. **Nature of Claim:** This count is brought against the **agency Defendants (DOJ/FBI and DHS)** under the Privacy Act of 1974. Plaintiff alleges that these agencies have maintained and disseminated **records pertaining to Plaintiff that are false and derogatory,** in violation of the agencies' duties under 5 U.S.C. § 552a(e)(5) to maintain accurate, relevant, and up-to-date records, and that such failures resulted in determinations adverse to Plaintiff's interests (triggering 5 U.S.C. § 552a(g)(1)(C) liability). Plaintiff further alleges that the agencies **willfully and intentionally** failed to correct these records and **disclosed them to unauthorized persons** or agencies (triggering 5 U.S.C. § 552a(g)(1)(D) liability). Plaintiff seeks **amendment of records, expungement, and damages** as permitted by the Act.

66. **Inaccurate and Misleading Records:** Defendants DOJ (including FBI) and DHS maintain records about Plaintiff in systems of records such as investigative files, watchlist databases, and intelligence reports. These records incorrectly describe Plaintiff as, inter alia, *"an insurrectionist," "violent actor," "domestic terrorist," or "associated with terrorism."* They may also inaccurately list him as a suspect in the January 6 pipe bomb investigation or other crimes. Such characterizations are

**factually false**: Plaintiff has never committed or been charged with any such offenses. The records are also incomplete and misleading, omitting exonerating context (for example, that Plaintiff's property was taken out of context, or that no charges exist). By retaining these false records, the agencies violated their obligation to keep records "with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination... about an individual" (5 U.S.C. § 552a(e)(5)).

67. **Adverse Determinations: Adverse Determinations:** As a result of these false and misleading records, Plaintiff was subjected to multiple adverse determinations by federal agencies. These included internal determinations assigning Plaintiff inaccurate or derogatory security identifiers, which signaled to other agencies that Plaintiff posed a risk and should be subjected to heightened scrutiny. These determinations—though never disclosed to Plaintiff—were disseminated across federal systems and contributed to the denial or obstruction of benefits, services, and opportunities, including interference with immigration processes affecting Plaintiff's family, reputational alerts to other governments or private partners, and restrictions on Plaintiff's ability to safely travel. While Plaintiff was not formally denied the ability to enter the United States, each instance in which he faced heightened scrutiny, credible risk of detention, or severe fear of wrongful arrest upon attempted travel constituted an adverse determination based on inaccurate federal records. Similarly, the collapse of Plaintiff's business relationships flowed directly from these determinations, which created the false impression that Plaintiff

was associated with criminal or extremist conduct. These consequences are concrete, ongoing, and materially adverse to Plaintiff's liberty, reputation, and economic interests.

68. **Willful or Intentional Violations:** The agencies' failures were **willful and intentional**. Plaintiff provided, or it was otherwise available, ample information that should have corrected the record. The agencies had actual knowledge, or at minimum reckless disregard, of the inaccuracies based on the evidence described in the factual allegations above. Instead of correcting their files, officials apparently chose to **double down on the false narrative**, possibly for face-saving or punitive reasons. Such deliberate indifference to the truth satisfies the Privacy Act's standard for willful or intentional agency action, as it goes beyond mere negligence. For example, even after Verizon's disclosure indicated that the data linking Plaintiff was improperly obtained, the agencies did not scrub that tainted data from their records. Even after no charges materialized for years, they did not update Plaintiff's status. This persistence can only be attributed to a knowing decision to leave the false data in place.

69. **Improper Disclosures:** The Privacy Act also prohibits disclosure of a record about an individual from a system of records without consent, unless an exception applies. On information and belief, FBI and/or DHS personnel **disseminated information about Plaintiff** to other entities beyond what is allowed. Possibilities include sharing with the Smithsonian or Congress identifying details of Plaintiff's item (which ended up in a public exhibit), or sharing watchlist status with foreign

governments or private airlines which then barred Plaintiff. Additionally, if any federal officials provided media or authors with information drawn from agency records about Plaintiff (even indirectly), that would be an unauthorized disclosure. Plaintiff may not know all such instances prior to discovery, but one clear example is that **Rep. Andy Kim** and his staff were aware of whose bottle it was and continued to display it – they likely learned the identity through official channels. Unless an exception (like a "routine use" or law enforcement request) squarely applies, such sharing is a Privacy Act violation. Given that these disclosures furthered no active law enforcement proceeding (since Plaintiff wasn't charged), they appear improper.

70. **Causation of Damage:** The false records and their dissemination have had a **materially adverse effect** on Plaintiff – essentially causing the entire cascade of harm previously described. But specifically under the Privacy Act: Plaintiff suffered **actual damages** including (but not limited to) financial loss from canceled contracts, costs incurred due to travel disruptions, loss of employment opportunities, as well as measurable emotional distress (which courts increasingly recognize as a form of actual damage under the Act). The link is direct: but for the false records marking him as a terrorist, Plaintiff would not have been put on watchlists (no exile), would not have been stigmatized in background checks (no business loss to that extent), and would not have undergone the extreme stress and humiliation that he did. Each improper disclosure or failure to correct further entrenched these damages.

71. **Relief Sought:** Under 5 U.S.C. § 552a(g)(2) and (g)(3), Plaintiff seeks **injunctive relief** to amend and correct the records, and under 5 U.S.C § 552a(g)(4), seeks **money damages** for the willful/intentional violations:

72. **Amendment/Expungement:** An order compelling DOJ and DHS to **amend Plaintiff's records** to remove all erroneous information. This includes removing derogatory labels, annotating files to show Plaintiff was never charged and is not considered a threat, and if necessary **expunging** records that cannot be reliably corrected. Specifically, any watchlist entries, intelligence reports, or investigative summaries concerning Plaintiff should be updated to reflect the truth (or deleted if baseless). The Court's order should ensure that any future retrieval of Plaintiff's file will indicate the correction (so that, for example, if Plaintiff's name is queried by law enforcement, it does not return a false "domestic terrorist" flag).

73. **Accounting of Disclosures:** Plaintiff requests an order under 5 U.S.C § 552a(c) requiring Defendants to provide an **accounting** of all disclosures made of Plaintiff's records, including what was disclosed, to whom, and when. This will allow identification and mitigation of any spread of false information. Any recipients of false data should be informed of the corrections.

74. **Injunctive/Declaratory Relief Against Future Violations:** Though the Act doesn't explicitly provide general declaratory relief, Plaintiff asks the Court to **declare** that Defendants' past maintenance of records was unlawful and **enjoin** them from maintaining such records in violation of the Act going forward. Essentially,

supervision to ensure compliance, possibly via periodic reporting to the Court that Plaintiff's records remain accurate and are not being misused.

75. **Actual Damages:** An award of monetary damages in an amount to be proven at trial. Given the scale of losses, Plaintiff's damages from Privacy Act violations are in the **multi-billion USD** (at least, e.g., lost income from specific contracts traceable to the stigma). The Privacy Act permits recovery of actual damages sustained as a result of the willful/intentional violation, plus costs and reasonable attorney's fees. Plaintiff will quantify his losses with documentation (such as the contracts and investments lost, see e.g. Exhibits **FF3–FF6** showing wire transfers and syndication deals disrupted, and Exhibits **FF1, JJ, II** containing valuation evidence). By conservative estimates, Plaintiff's personal financial loss well exceeds $60 Billion USD, and the broader business valuation loss was on the order of **hundreds of billions** of dollars (however, Plaintiff understands the Privacy Act's damages remedy may be interpreted to cover more direct losses and emotional harm, which he will detail). Additionally, Plaintiff claims damages for the emotional distress and mental anguish caused by the Privacy Act violations, which manifested in diagnosable conditions and require compensation.

76. **Fees and Costs:** Award Plaintiff the costs of this action and reasonably incurred attorney's fees (noting Plaintiff is pro se at this time, but if counsel is retained or to the extent allowable for pro se litigants for costs).

77. Plaintiff alleges that all the above violations of the Privacy Act were **intentional or willful**, entitling him to relief. The evidence of the agencies' knowledge (or reckless disregard of warnings) will be shown through exhibits and testimony (for example, communications acknowledging issues with Plaintiff's data that went unheeded).

78. Plaintiff reserves the right to seek any **additional relief under the Privacy Act** that becomes appropriate as information unfolds, including referring any egregious conduct to the Office of Special Counsel or Inspector General, although that is ancillary to the judicial relief sought here.

# VII. Prayer for Relief

WHEREFORE, Plaintiff Washington Hope respectfully requests that this Court enter judgment in his favor and grant the following relief:

## A. Declaratory Relief:

1. **Declaration of Rights Violations:** A declaratory judgment pursuant to 28 U.S.C. § 2201 that Defendants' actions, as set forth above, violated Plaintiff's rights under the Fifth Amendment to the U.S. Constitution (including the Due Process Clause and its equal protection component) and violated the Administrative Procedure Act and Privacy Act. This includes declarations that:

    a) Plaintiff's constitutional right to due process was infringed by Defendants' stigma-plus actions and constructive exile of Plaintiff without charge or hearing;

b) Plaintiff's fundamental rights to travel and familial integrity were violated by Defendants' conduct;

c) Defendants' selective treatment of Plaintiff was unconstitutional discrimination lacking any lawful justification;

d) The agency Defendants' maintenance and use of false information about Plaintiff was arbitrary, capricious, and not in accordance with law; and

e) The DOJ and DHS (including FBI) failed to maintain accurate records concerning Plaintiff and made unauthorized disclosures, in violation of the Privacy Act.

2. **Invalidation of Ultra Vires Acts:** A declaration that any executive or administrative orders, watchlist placements, or other instruments that purported to impose sanctions or restrictions on Plaintiff (such as any **no-fly designation,** "selectee" status, or similar watchlist status) are **null and void** as applied to Plaintiff, for being issued in excess of authority and in violation of law.

## B. Injunctive Relief:

3. **Removal from Watchlists:** A permanent injunction requiring Defendants and all relevant government agencies to **remove Plaintiff's name and identifiers from any terrorism watchlist, no-fly list, or similar list** for which he was nominated or placed as a result of the events described, and to cease all associated monitoring or restrictions of Plaintiff that arose from the improper designations.

4. **Correction/Expungement of Records:** An order directing Defendants DOJ, FBI, DHS, and any other applicable agency to **correct or expunge all inaccurate or derogatory records** about Plaintiff in their possession. This includes (but is not limited to) records in investigative files, intelligence databases, lookout systems, and public relations materials. The agencies shall append such records with statements noting the corrections (so any future retrieval reflects this Court's order). All references to Plaintiff as violent, threatening, or connected to terrorism or criminal activity related to January 6, 2021, should be **removed or corrected** to reflect that Plaintiff has **no charges and no determination of wrongdoing.**

5. **Return of Property:** An injunction compelling the appropriate Defendant(s) to **return to Plaintiff any personal property** of his that remains in government custody or control, including the prescription bottle or any other item taken from January 6 events. If the item is held by a third party (e.g., Smithsonian), Defendants shall facilitate its return or, at minimum, removal from public display pending return. Additionally, order Defendants to remove Plaintiff's name or implied likeness from any exhibits, publications, or displays under their control that associate him with criminal or violent conduct.

6. **Cease Further Dissemination:** An injunction prohibiting Defendants from **disseminating or publishing any false or stigmatizing information** about Plaintiff in the future. This includes instructing government officials (and requesting the same of the Smithsonian and other entities if appropriate) to refrain from using Plaintiff's story or property as a symbol of criminal activity. Any necessary

communication to downstream recipients of the false information (such as clearing interpol notices, border watch entries, etc.) should be made to ensure the cleansing of Plaintiff's record is effective.

7. **Facilitation of Re-entry:** A mandatory injunction directing Defendants to **allow and facilitate Plaintiff's safe return to the United States.** Specifically, upon Plaintiff's attempt to travel to the U.S., Defendants (through DOJ, DHS, and any other relevant authority) must ensure that Plaintiff is not detained, harassed, or impeded on the basis of any now-corrected record or watchlist hit. If needed, the Court might require Defendants to provide Plaintiff or his counsel with documentation of this Court's orders to present to carriers or border agents, and to have a point of contact available to resolve any issues during transit. Further, if Plaintiff requires assistance in arranging travel (due to prior revocation of travel authorization), Defendants should provide such assistance.

8. **Immigration/Family Relief (if applicable):** Injunctive relief directing any relevant agencies (potentially DHS or Department of State, if within the Court's equitable power in this case) to **waive or suspend any regulatory requirements** that unfairly burden Plaintiff as a result of Defendants' past actions — for example, if Plaintiff must sponsor a foreign spouse or child for U.S. entry, any income requirements or security checks influenced by the now-nullified designations should be waived or expedited, so that Plaintiff's family can reunite with him in the U.S. without further delay. *(This sub-paragraph is requested to ensure full restoration of Plaintiff's family integrity and may be tailored by the Court as appropriate.)*

9. **Preservation and Oversight:** Given the history of evidence spoliation and concealment, Plaintiff requests that the Court issue appropriate orders to **preserve all relevant records** and evidence in Defendants' possession related to the matters of this case (to prevent further destruction or alteration). The Court may retain jurisdiction to oversee compliance with its orders, and require periodic reporting by Defendants confirming that Plaintiff's name remains cleared and that no retaliation or re-listing has occurred.

## C. Monetary Relief:

10. **Compensatory Damages:** An award of compensatory damages against the *individual capacity Defendants* for the constitutional tort claims (Counts I–III) in an amount to be determined at trial, to compensate Plaintiff for the violations of his constitutional rights. This includes damages for emotional distress, loss of reputation, and other non-economic harm, as well as economic damages for loss of income and opportunities attributable to the unconstitutional acts. Given the severity of Plaintiff's losses, Plaintiff expects this amount to be substantial, potentially in the **tens of millions of dollars**, but defers to proof at trial and the jury's sound judgment.

11. **Privacy Act Damages:** An award of actual damages under the Privacy Act (Count V) against the United States (through the agencies) in the amount of **no less than $1,000,000** (one million dollars) or such greater amount as is proven, for the willful and intentional violation of Plaintiff's rights under that Act. This figure includes but is not limited to Plaintiff's concrete financial losses and emotional distress

attributable to the maintenance and disclosure of false records. *(Plaintiff will itemize and prove these damages during proceedings; this figure is stated to satisfy notice requirements and is without prejudice to adjustment as needed.*

12. **Punitive Damages:** An award of punitive damages against the individual Defendants, in an amount to be determined, for their **reckless or callous indifference** to Plaintiff's rights and their egregious misconduct. Punitive damages are warranted here to punish and deter the kind of lawless extrajudicial punitive actions that Defendants undertook. (Punitive damages are not sought against the United States or agencies, as they are not available by law against the sovereign.)

## D. Ancillary Relief:

13. **Attorneys' Fees and Costs:** An award to Plaintiff of his costs of suit and, if he retains counsel or as permitted by law, reasonable **attorneys' fees**. This request encompasses fees available under the Privacy Act (5 U.S.C. § 552a(g)(4)(B)), the Equal Access to Justice Act, or any other applicable fee-shifting provision, as well as the Court's inherent equitable powers (in the event of bad faith conduct by Defendants). Although Plaintiff proceeds pro se at this time, he reserves the right to seek fees for any counsel work performed or to recover other litigation expenses.

14. **Any Other Relief:** Such other and further relief as the Court deems just and proper, including any relief identified in Section IV (Reservation of Claims) that becomes ripe and is sought by amendment, and any remedial measures needed to fully restore Plaintiff's rights and positions as if the wrongful acts had not occurred.

15. **JURY DEMAND:** Plaintiff preserves and asserts the right to a trial by jury on all issues so triable, but reserves the option to consent to a bench trial at a later stage should it become appropriate.

**Respectfully submitted,**

**Washington Hope**

Dated: November 24, 2025
Cozumel, Quintana Roo, Mexico
Washington Hope, Plaintiff pro se
[Mailing Address under seal]
["Exile Location – Mexico"]

#2 Complaint